## THE LAKEWOOD GAS COMPANY

*v.*

## GEORGE G. SMITH.

.[Filed January 21st, 1902.]

1. The president of a company was a rival claimant of certain unissued stock, and, taking advantage of his position, without being authorized, had the treasurer issue the stock to him. He had no reason ·to believe that the directors would authorize the issuance of the stock to him, and had notice that they would not award the stock to either claimant without arrangement for the company's protection.—*Held*, sufficient to show that the issuance of the certificate was unauthorized and without force· as a muniment of title.

2. Where the president of a corporation, without authority, procures an issuance to himself of corporate stock of which he is a rival claimant, a contention that he should be compelled to ·surrender the certificate because he was depriving the company of its right to compel the claimants to interplead, is without merit, as his unauthorized act did not affect the company's power to protect itself by an interpleader suit.

On bill, answer and proofs.

*Mr. Charles D. Thompson,* for the complainant.

*Mr. Frank P. McDermott,* for the defendant.

STEVENSON, V. C.

The principal object of this suit is to compel the defendant, George G. Smith, to surrender to the complainant for cancellation a certificate representing eighty shares of the capital stock of the complainant of the par value of $8,000. The certificate bears date January 10th, 1901, and is in the usual form under the seal of the company, signed by the defendant, as president, and one Walter C. O'Leary, as treasurer, of the company.

The first matter to be determined is whether the issuing of this stock to the defendant was the act of the company or the

unauthorized act of the defendant. The defendant procured the execution and delivery of the certificate to himself, taking advantage of his position as president of the company. Both himself and Mr. O'Leary, the treasurer, were anticipating the transfer of the control of the company to a party whom the defendant could not influence and who would probably be unfriendly to his interests. There is no evidence whatever that the corporation had ever authorized these officers to exercise the power of the corporation with reference to the issue of stock. Their duties, as president and treasurer, respectively, with reference to the execution and delivery of stock certificates, were purely clerical or ministerial. These particular eighty shares constituted the last unissued stock of the total authorized capital of $100,000. Practically the whole capital had been issued by the company to pay for the construction of its gas works under a written contract which provided that the stock should be issued to the contractor "as the work progressed." There is no evidence that any of this stock was ever issued excepting after the board of directors had satisfied themselves that the progress of the construction work warranted such issue. As will be seen in dealing with another branch of the case, there were two claimants for this last portion of the capital stock, these eighty shares, and the matter of its issue had been considered by the board of directors of the company. The defendant was one of these two claimants. He had no reason to believe that a regular meeting of the board of directors would authorize the issue of this stock to him, but on the contrary had distinct notice that such a result was highly improbable; that the board of directors would not award this stock to either of the two claimants without satisfactory arrangements being made for the protection of the company.

The circumstances under which this stock certificate was issued to the defendant, in my opinion, deprived it of its force as a muniment of title. The defendant must surrender the certificate unless he can show affirmatively that at the time it was issued he had a right to the shares of stock of the company which the certificate represented, and that the company therefore owed him the duty of giving him the usual written evidence of his ownership. Whether the defendant, on the 10th

day of January, 1901, was so entitled to receive eighty shares of stock, has been litigated in this case. The complainant insists that the defendant is obliged to surrender the certificate because of its unauthorized issue without regard to the question whether the defendant was entitled to the stock or not. This position seems to me to be untenable. If the defendant, in fact, owned the eighty shares of stock he had a right to receive the certificate, and his act in procuring the certificate to be issued to himself was merely an administrative act which the corporation was obliged to have performed on his behalf. There would be no advantage in compelling the surrender and cancellation of this particular certificate if the defendant would have the right to demand and receive another in its place.

The complainant, however, further insists that there is a special reason in this case why the defendant should be compelled to surrender the stock certificate which he obtained, and that is because it appears that the corporation was holding back the issue of this particular eighty shares of stock in order to secure the settlement of the demands of the two rival claimants. The defendant had notice of this situation, and by his act deprived the company of the advantage of its position, including particularly its right to compel the claimants to interplead. The argument proceeds upon the theory that without the certificate for the eighty shares of stock to present in court, the complainant is deprived of this equitable remedy. But I do not think that the unauthorized act of the defendant in issuing the stock to himself in the slightest degree affected the power of the corporation to protect itself by an interpleader suit. There might be many unauthorized certificates for the same stock outstanding in the hands of different claimants, and as many more claimants without certificates. I can perceive no reason in such a case why the corporation should not make all the claimants, both those holding certificates and those without certificates, defendants to a bill in the nature of a bill of interpleader, holding the certificates within the power of the court by a preliminary injunction such as was issued in this case. The certificate in this case, as in all cases, is a mere voucher, a mere receipt establishing when regularly issued, a *prima facie* title in the holder to the

shares of stock named therein. It is the ownership of the stock which is to be decided in this suit and would be decided in such an interpleader suit as we have been considering; the possession of the stock certificate is a mere incident.

The complainant has not seen fit to make the other claimant to the eighty shares of stock in dispute a party to this suit as, in my judgment, it might have done by presenting this bill in a different form.

The defendant, in his answer, in effect admits frankly that he procured the certificate of stock to be issued to himself in order to protect his legal rights against any possible action which the company under its change of management might see fit to take. He bases his defence solely upon his right to the stock in dispute.

The question to be determined is whether the defendant, on January 10th, 1901, was entitled to these particular eighty shares of stock of the complainant company and as the owner of such stock was entitled to receive a certificate representing the same. The affirmative, as I have stated, is with the defendant.

The complainant was organized, under the general act for the incorporation of gaslight companies, in April, 1899, its object being the construction and operation of gas works in the village of Lakewood. On May 18th, 1899, the complainant entered into a written contract with B. Van Steenburgh, trustee, by the terms of which Mr. Van Steenburgh was to erect certain gas works, described therein, and deliver the same to the complainant on May 1st, 1900, in complete working order and free from debt, except certain mortgage bonds. The price of this plant was to be paid largely in the first mortgage bonds and capital stock of the complainant, the bonds to be delivered on demand as soon as they could be issued and legally executed, and the stock, as above stated, to be delivered "as the work progressed."

The evidence affecting the ownership of the eighty shares of stock in dispute commences in December, 1899, by which time a large part of the construction work had been done and the greater part of the stock had been issued to the contractor, Mr. Van Steenburgh, in payment therefor. This evidence is, in some re-

spects, meagre, and consists almost exclusively of records and documents. In addition to this documentary evidence we have the answer of the defendant, under oath. None of the persons who had knowledge of the transaction under investigation was sworn as to any of those matters, except Mr. Van Steenburgh, who was examined briefly on one comparatively unimportant matter. The parties to this suit evidently were satisfied with the case which is presented by the written evidence, which was put in substantially without objection. The various papers may therefore be taken as true, in the absence of evidence contradicting them and as speaking from their respective dates.

On December 18th, 1899, a meeting of the board of directors was held, at which the board declined to issue further stock to Mr. Van Steenburgh, but instructed its secretary to write to him that the board was

"willing to turn over all the stock to him upon his giving satisfactory security that the plant will be turned over free and clear and according to contract."

At this meeting a statement was received from Mr. Van Steenburgh, showing that he was indebted for material, &c., to the amount of $9,599.52.

At a later meeting, held December 21st, 1899, the directors appointed a committee

"to investigate the security offered by Mr. Van Steenburgh for the completion of his contract and for the payment of all liabilities incurred against the plant by the contractor, and resolved that if such security should be satisfactory to the committee that the secretary be authorized to issue the balance of the stock of the company to Mr. Van Steenburgh."

What security was referred to is, perhaps, not entirely clear. The original contract of May 18th, 1899, was accompanied by a covenant of two sureties for the performance of the contract by B. Van Steenburgh, trustee. It is probable, however, that the corporate action above mentioned related to security which Mr. Van Steenburgh was then offering. However this may be, it would seem that the security was not satisfactory to the committee, and the indications are that Mr. Van Steenburgh's financial

situation was such as to prevent him from carrying out his contract.

On January 11th, 1900, an assignment of the construction contract was executed by B. Van Steenburgh, trustee, to Edwin R. Case, who is the other claimant of the eighty shares of stock, in the following words:

"In consideration of your assuming and complying with all the obligations contained in the within contract and the payment of the bills amounting to about $9,900, as per memorandum attached hereto, I hereby assign to you all my interest in the within contract subject to the approval of the directors of the Gas Company.

"B. Van Steenburgh, *Trustee,*
"N. Y. Jany. 11, 1900.                    "Witness J. H. DeRoe."

The assignee, Mr. Case, had at this time secured the control of the board of directors of the company. For some reason he did not immediately apply to the directors for their approval of the assignment which he had obtained, and the substitution of himself for B. Van Steenburgh, trustee, called for thereby. He appears to have been content to have Mr. Van Steenburgh remain apparently as the contractor while he (Case) backed him up with financial and other support.

The next meeting of the board of directors after the meeting of December 21st, 1899, was held on January 17th, 1900, at which the committee previously appointed, reported in effect that they were endeavoring to procure a statement from the contractor showing the work done, &c. The record shows that Mr. Van Steenburgh came into the meeting and thereupon a motion was made that the company issue two hundred and fifty shares of stock of which fifty were to be used to pay for land "and the balance of two hundred shares to be delivered to Mr. Van Steenburgh," upon delivery to the president of the company of a

"certified check for $5,000 to the order of the gas company to be left with the company as security and a surety signed by Edwin R. Case that the contract of B. Van Steenburgh, Trustee, with the gas company will be completed and all matters carried out in accordance therewith."

This motion was carried, no vote being recorded, but no record appearing of any opposition. The defendant, Mr. Smith, was

present at this meeting and presumably presided as president of the company.

The answer of the defendant alleges that

"on the 18th day of January, 1900, the said Edwin R. Case executed a bond as surety for the said B. Van Steenburgh, Trustee, to the said complainant company whereon he became bound for the faithful performance of the said contract by the said B. Van Steenburgh, Trustee."

It is fairly inferable from what appears in the later documentary history of the transaction under investigation that Mr. Case not only entered into this bond of suretyship, but also furnished the certified check for $5,000, which the resolution called for. Thus it appears that Mr. Case made himself absolutely liable to the corporation for the performance of this contract at a time when there was very little more stock and no bonds which could be earned under the contract. The inference is unavoidable that Mr. Case incurred this liability relying upon the assignment of the contract which he held from Mr. Van Steenburgh, and which, as against Mr. Van Steenburgh, was absolute.

On March 10th, 1900, the board of directors refused to comply with Mr. Van Steenburgh's request, or a request made in his name, for the balance of unissued stock, and resolved that such stock should not be turned over until an expert had examined and reported on the plant and contract.

The first official notice to the company of the assignment to Mr. Case appears to have been on April 26th at a meeting of the board of directors. A resolution was then adopted that Mr. Case "be accepted and substituted in the place of B. Van Steenburgh," &c., in the assignment of May 18th, 1899, upon certain specified conditions. Among these conditions were that the deposit of $5,000 in cash made by Case, and then in the hands of the company, as security for the performance of the contract, should "remain in the hands of said gas company until the conditions of said contract are complied with fully by said Case;" that said Case should pay the interest on the bonds of the company which would be due May 1st, 1900, and that the said Case sign an agreement with the company to be substituted as principal in the contract, and to "accept all the terms thereof, and also procure

from said B. Van Steenburgh his written consent, in due form of law, to said substitution." It was further resolved that upon the acceptance of the foregoing conditions by Mr. Case, that the time for "completion of said contract" be extended to May 15th, 1900.

Mr. Case complied with the conditions above mentioned and delivered to the company the written consent of Van Steenburgh which was called for, and also a written instrument, signed by himself, whereby he agreed and consented to be substituted in the place of Van Steenburgh "as principal in said contract to perform the conditions thereof," and also agreed that his deposit of $5,000 in cash should remain in the hands of the company until the conditions of the contract should be fully complied with, and also agreed to pay the interest of the bonds which would be due on the 1st of the following May.

Whatever day may be assigned to the completed transfer of the contract from Van Steenburgh to Case, it is plain that Mr. Van Steenburgh never earned the eighty shares of stock in dispute under the terms of the contract or otherwise. The stock, as we have seen, was to be paid over as the work progressed, and the last stock issued would naturally be in payment for the last work done. From the records which have been offered in evidence it would appear that the assignee, Mr. Case, was obliged to do considerable work before it could be seriously claimed that there was a performance or substituted performance of the contract or acceptance of the work which the contractor had done. Negotiations between Mr. Case and the company took place in regard to a defect in the tank and the control thereof, and the parties became somewhat antagonistic. An offer of settlement was made by the company, rejected by Case and then withdrawn. On November 17th, 1900, the directors of the company resolved that Case had failed to complete his contract, and that the time for completion had passed, and that the company demand delivery of the plant from Case, and that proceedings be instituted to obtain possession of the plant if the same should not be delivered, and that the obtaining possession of the plant should not be a waiver of any claims against Case for his "not completing his contract according to the terms thereof." While matters were

Lakewood Gas Co. *v.* Smith.

in this situation a number of the directors retired and persons were elected in their place who apparently were favorable to Mr. Case's claims. The result was a settlement of the matters in dispute between Mr. Case and the company. By the terms of this settlement the plant was accepted "as complete under the contract." Mr. Case was released from further liability, various matters, such as the moneys collected from consumers of gas, were adjusted, the $5,000 deposit was paid back to Mr. Case and a certificate for fifty-nine shares of capital stock was delivered to Mr. Case, leaving the eighty shares unissued.

It was also resolved at this meeting that the matter of eighty shares of the capital stock of the company, which was the last installment payable under the contract, "be not acted upon before January 10th, 1901."

The eighty shares of stock were retained because of claim to the same which had been put forward by the defendant, Mr. Smith, based upon an equitable assignment thereof alleged by Mr. Smith to have been made to him by Mr. Van Steenburgh on November 27th, 1899. On that date Mr. Van Steenburgh bought certain bonds from Mr. Smith and gave a receipt therefor in which he agreed as the price of the bonds "to deliver to George G. Smith eighty shares of the Lakewood Gas Company stock within thirty days or sooner if possible." At a later date, within about a month and probably on the next day, Mr. Van Steenburgh executed and delivered to Mr. Smith a written document as follows:

"LAKEWOOD, N. J., Nov. 27th, 1899.

"*Lakewood Gas Co.:*

"GENTLEMEN—In accordance with agreement between Geo. G. Smith of Lakewood, N. J., and B. Van Steenburgh, Trustee, under date of Nov. 27th, 1899, in which I agreed to deliver to Geo. G. Smith within thirty days from date thereof, eighty shares of stock of the Lakewood Gas Co., in payment for five bonds of five hundred dollars each of said Lakewood Gas Co. this day delivered to me, I do hereby authorize the Lakewood Gas Co. to deliver to Geo. G. Smith of Lakewood, N. J., a certificate for eighty shares of stock of the Lakewood Gas Co. of Lakewood, N. J.

"B. VAN STEENBURGH,
"*Trustee.*"

The answer of the defendant, which, according to the prayer of the bill, is under oath, alleges that at the meeting of the board

of directors above mentioned, held on January 17th, 1900, the defendant

"notified the Board of Directors that he had paid full consideration for and was entitled to eighty shares of the capital stock of said company, to be issued under the said contract, made by said company, with the said B. Van Steenburgh, Trustee, and requested that the same be issued to him."

Admitting that this allegation is evidence on the part of the defendant, it should be observed that the directors were not notified from whom or in what manner Mr. Smith had acquired his right to eighty shares of stock to be issued under the contract. Mr. Smith merely stated that he had paid someone for these shares, and, in his judgment, was entitled to them. It was at this same meeting of the board that the motion, above mentioned, was made providing for the issue of two hundred and fifty shares of stock to Mr. Van Steenburgh, upon his giving to the defendant, as president of the company, a certified check for $5,000 and an obligation of Mr. Case as security for the performance of the contract. That the position of the company was that no more stock was due, under the contract, to Mr. Van Steenburgh seems to have been plain to the defendant at that time.

At a meeting of the board of directors held April 18th, 1900, a resolution was adopted

"that M. G. G. Smith, having asked for eighty shares of stock on order of B. Van Steenburgh, trustee, that said order be placed on file with the company."

This seems to have been the first formal notification made by the defendant of his alleged equitable assignment.

The defendant, after he had made his bargain for the stock with Mr. Van Steenburgh, on November 27th, 1899, and a little later procured the order or authorization permitting the company to issue eighty shares of stock to him, for some unexplained reason seems to have allowed all the stock which Mr. Van Steenburgh could possibly have earned under his contract with the company to be issued and paid out in accordance with his (Mr. Van Steenburgh's) direction. Why the defendant permitted the two hundred and fifty shares of stock, the certificates for which

he must have signed as president, which were ordered issued by the board in January, 1900, to slip through his fingers is not explained. It appears that later the original terms of the construction contract were amended to correct an admitted mistake, and the directors, in accordance with a vote of the stockholders, issued one hundred shares of the capital stock. This was done in ———, 1900, subsequent to the presentation of Mr. Smith's so-called equitable assignment to the board of directors.

It is unnecessary to discuss the questions whether the order which Mr. Smith received from Mr. Van Steenburgh operated as an equitable assignment of any stock, excepting the particular eighty shares in litigation. Nor is it necessary to consider whether Mr. Smith, by any laches, lost his right, as against the company or as against Mr. Case, to demand and receive eighty shares of stock out of any stock which was issued prior to the time when all the capital stock had been issued, except these eighty shares.

In my judgment the defendant's whole claim is disposed of by the proposition that these eighty shares of stock were never earned by Mr. Van Steenburgh, and never, in case he had made no equitable assignment thereof, would have been due from the company to him.

Upon no possible construction of this order does it seem to me can it be considered as an assignment of the construction contract. It gave no right to Mr. Smith, with or without the approval of the directors of the company, to take Mr. Van Steenburgh's place in the performance of the work contracted for. It was never more than the ordinary order which a contractor frequently gives upon the party for whom he is doing work for a payment of money which is due, or will become due, to the contractor in pursuance of his contract. Such orders have been held frequently to operate as equitable assignments upon funds which have not been earned, but which probably will be earned, and thus have a potential existence. There is no difference between the stock which Mr. Van Steenburgh was earning under this contract and a money consideration which might be so earned. If the money or the stock is earned, the order may attach to it as an equitable assignment, the other necessary con-

ditions occurring. But if no money or no stock is earned, the equitable assignment becomes wholly inoperative.

No case has been cited to sustain the extraordinary proposition that an order by a contractor for moneys which he expects to earn operates as an assignment of his contract, even though the party accepting the order assumes none of the obligations of the contract.

Assuming that the papers which the defendant received finally took effect as an equitable assignment of stock, they only could transfer stock which might become due from the company to the assignor, Mr. Van Steenburgh. The defendant in this case not only fails to show affirmatively, as he was bound to do, that the eighty shares of stock in dispute were earned by Mr. Van Steenburgh, or in some way became due from the company to him, but the proofs apparently establish the contrary, and show that these particular eighty shares were earned by Mr. Case, after the assignment of the contract to him and after he had expended considerable amounts of money in the completion of the contract work, and had, at length, negotiated a settlement between himself and the company.

The proofs, I think, also show that these eighty shares of stock were earned by Mr. Case, not under the original contract with Mr. Van Steenburgh, but under what was practically a new or substituted contract between himself and the gas company. Mr. Case was compelled to give new security and execute a new contract directly with the company, by which he obligated himself to finish the gas works within the further period of time which the company allowed for that purpose.

I shall advise a decree that the certificate for the eighty shares of stock held by the defendant be surrendered to the complainant for cancellation.